UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| MARLENE ELIZABETH HOLLAND, On Behalf of herself and All Others Similarly Situated, | ) ) ) | Case No.: 14-cv-447 |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | COMPLAINT FOR VIOLATIONS OF |
| | ) | THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | DEMAND FOR JURY TRIAL |
| THOMAS GUTIERREZ, RICHARD J. GAYNOR, and KANWARDEV RAJA SINGH BAL, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Marlene Elizabeth Holland ("Plaintiff"), individually and on behalf of all others

similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against the

defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's

own acts, and upon information and belief as to all other matters based on the investigation

conducted by and through Plaintiff's attorneys, which included, among other things, a review of

Securities and Exchange Commission ("SEC") filings by GT Advanced Technologies Inc.

("GTAT" or the "Company"), as well as press releases, media reports, and conference call

transcripts.  Plaintiff believes that substantial evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased the common

stock of GTAT between November 5, 2013 and October 6, 2014 (inclusive up to approximately

10:00 a.m. Eastern Standard Time on October 6, 2014) (the "Class Period"), seeking remedies

under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted

against certain of GTAT's current and former executive officers.

2.      On November 4, 2013, GTAT announced that it had entered into a multi-year

agreement with Apple Inc. ("Apple") for the production of sapphire material for Apple's products

(the "Apple Contract").  Under the Apple Contract, Apple would provide GTAT with a $578

million down-payment, which was payable in four installments and would be repaid by GTAT

over the course of five years starting in 2015.

3.      Over the course of the following 11 months, GTAT's executive officers proceeded

to assure and reassure investors with bullish statements as to the Company's progress and

production under the Apple Contract.  As late as August 26, 2014, in a GTAT investor presentation,

the Company continued its representations regarding its ability to produce sapphire material for

Apple and Apple's acceptance of the sapphire material.  For example, the presentation stated that

"Newly expanded sapphire materials business with Apple is expected to add recurring revenue

base to business."

4.      However, contrary to the Company's representations, Apple disclosed on

September 9, 2014 that GTAT's sapphire glass would not be used in production.  On this news,

the price of GTAT stock dropped from $17.15 per share to $12.78 per share over two trading days,

or over 25%.

5.      Then, less than a month later, on October 6, 2014, GTAT shocked the market by

announcing that it had filed for bankruptcy.  Contrary to prior statements, GTAT revealed that it

was in dire straits in terms of its cash position and that it would not be receiving any more money

from Apple under the terms of the Apple Contract.  On this news, the price of GTAT common

stock declined from $11.05 per share to $0.80 per share, or almost 93%, on heavy trading volume.

JURISDICTION AND VENUE

6.      The claims asserted herein arise under §§ 10(b), 20(a) and 20(A) of the Exchange

Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is

conferred by § 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      Venue is proper in this district pursuant to § 27 of the Exchange Act.  Acts and

transactions giving rise to the violations of law complained of occurred in this District.  In

connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the

means and instrumentalities of interstate commerce, including, but not limited to, the mails,

interstate telephone communications, and the facilities of the national securities markets.

THE PARTIES

8.      Plaintiff, Marlene Elizabeth Holland, purchased GTAT common stock on the

NASDAQ stock market ("NASDAQ") during the Class Period as described in the attached

Certification and was damaged thereby.

9.      Defendant Thomas Gutierrez ("Gutierrez") is, and was at all relevant times,

GTAT's President, Chief Executive Officer, and Director.

10.     Defendant Richard J. Gaynor ("Gaynor") was, at all relevant times, Vice President

and Chief Financial Officer of the Company until his resignation on March 11, 2014.

11.     Defendant Kanwardev Raja Smith Singh Bal ("Bal") was appointed Chief Financial

Officer of the Company effective March 7, 2014.

12.     Defendants Gutierrez, Gaynor, and Bal are collectively referred to hereinafter as

the "Defendants."  The Defendants, because of their positions with GTAT, possessed the power

and authority to control the contents of GTAT's reports to the SEC, press releases, and

presentations to securities analysts.  Each of the Defendants was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

13.     Non-party GTAT is headquartered in Merrimack, New Hampshire.  The Company produces materials and equipment for the solar, light emitting diode, and electronics industries, including sapphire materials which were the subject of the Apple Contract.  As of October 6, 2014, GTAT filed for protection under Chapter 11 of the United States Bankruptcy Code and is therefore not a named defendant.  At all relevant times, the Company's common stock traded on NASDAQ, which is an efficient market, under ticker symbol "GTAT."  GTAT's headquarters are located at 243 Daniel Webster Highway Merrimack, New Hampshire.

## BACKGROUND

14.     GTAT announced its agreement with Apple—the Apple Contract—on November 4, 2013.  Pursuant to the terms of the Apple Contract, Apple financed the purchase of a 1.4 million square-foot facility in Mesa, Arizona (the "Arizona Facility") and agreed to pay GTAT a $578 million down-payment in exchange for GTAT's development of sapphire crystallization furnaces and related equipment.  Once completed, GTAT would move in and begin producing sapphire material strictly for Apple and, potentially, its use in the iPhone 6.

15.     Apple's down-payment to GTAT (the $578 million) was to be paid in four installments, provided GTAT was able to produce on-specification sapphire material at the requisite quantities.  As long as GTAT could meet its obligations under the Apple Contract, GTAT

would be permitted to repay the money over the course of five years beginning in 2015.  If, however, GTAT was unable to do so, Apple could demand repayment of all monies paid thus far.

16.       In addition to the unfavorable payment terms, GTAT also agreed that Apple would be under no obligation to purchase some or all of the sapphire materials produced.  Apple was also able to limit the amount of sapphire material GTAT could sell to third-parties in the event Apple declined to purchase GTAT's production.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS

### *November 4, 2013*

17.       On November 4, 2013, GTAT announced in a press release that it "expect[ed] [the Apple Contract] to be cash positive and accretive to earnings starting in 2014," and that the Company's sapphire segment would comprise up to approximately 80% of GTAT's 2014 estimated $600 million to $800 million of total revenue.  Defendant Gutierrez further stated that "[b]y leveraging the new materials operation and our enhanced R&D efforts, we will be well positioned to drive the growth of other sapphire opportunities."

18.       Following the market's close on November 4, 2013, GTAT held its earnings conference call for the quarter, at which time Defendant Gutierrez described the Apple Contract as "a significant milestone in GT's diversification strategy, and it provides a path to add a recurring revenue stream to our otherwise cyclical equipment business model."  Defendant Gutierrez also represented that "[w]e have confidence in the long-term value of this opportunity given the financial and technical resources that both parties are dedicating to the project," and that the Company was in a "good position" with regard to its capital and financing.

19.       On the same call, then-Chief Financial Officer, Defendant Gaynor, represented that GTAT ended the quarter with approximately $258 million of cash and cash equivalents, and that

"we are confident that our projected cash levels are adequate to run the business for the foreseeable future." Defendant Gaynor also announced that the Company was lowering its 2013 revenue guidance from $500 million-$600 million to $290 million-$320 million indicating that the Company's furnace equipment, which they expected to ship to customers, will now likely be used for making their own sapphire. According to Defendant Gutierrez, the Company expected 2015 revenues to exceed $1 billion, and expected revenues to nearly double from 2014 levels due in substantial part to the Apple Contract.

20. The statements set forth above in ¶¶ 17-19 were materially false and misleading because Defendants were aware that, in light of the Apple Contract's terms, the Apple Contract would not yield results for GTAT as represented, GTAT would not benefit from additional revenue in 2014, and that GTAT's 2014 guidance was impossible to meet given the restraints impacting GTAT under the Apple Contract.

*December 2, 2013*

21. On December 2, 2013, GTAT filed a Registration Statement and, subsequently two prospectuses, in connection with a $300 million offering (collectively, the "Registration Statement"). In the Registration Statement, Defendants stated that "[w]e expect that our sapphire material operations will constitute a larger portion of our business going forward than in the past as a result of our supply arrangement with Apple." Between the various offerings, which included sales of both debt and equity securities, GTAT sold $214 million worth of 3.00% Convertible Senior Notes due 2020 and 9,942,196 shares of its common stock at $8.65 per share on or around December 4, 2013.

*February 24, 2014*

22.     On February 24, 2014, GTAT held its earnings conference call for the fourth quarter of its 2013 fiscal year.  On the call, Defendant Gutierrez announced that GTAT received the first two of four payments from Apple toward the down-payment under the Apple Contract.  According to Defendant Gutierrez, "[w]e're very pleased to have Apple as a sapphire customer, and to be in a position to leverage our proprietary know-how to enable the supply of this versatile material to them."  Defendant Gaynor explained that the Company ended 2013 with approximately $593 million of cash and cash equivalents and restricted cash.  Defendant Gaynor further stated that, "the combination of Apple prepayments received to date, and to be received in the future, will fully fund the capital outlay in Arizona."  To this end, Defendant Gaynor stated that GTAT started the year with $593 million in cash, and has received $225 million under the Apple Contract with "another $350 million to come from that."  Defendant Gaynor even stated that GTAT expected to spend "some $550 million in terms of investment into the Arizona facility . . . [and] that we expect to have some additional cash from operations being generated during the year."

23.     The statements set forth above in ¶ 22 were materially false and misleading because Defendants knew that Apple's payments to GTAT would be insufficient to fund the capital outlay for the Arizona Facility and that there was a substantial risk that Apple would force the Company to repay monies received and/or would withhold future prepayments.  Further, Defendants knew that the Company was experiencing significant cash shortages as a result of the Apple Contract.

*March 14, 2014*

24.     On March 14, 2014, GTAT held a new product and technology briefing.  During the briefing, Defendant Gutierrez stated that "We talked about the Arizona project.  We talked about the fact that it's going quite well.  We've received our initial prepayments.  We're adding

staff and building out the facility.  And we've deployed most of the $180 million of plant, property and equipment that we deployed in the fourth quarter, in the fourth quarter was deployed in Arizona."

25.    The statements set forth above in ¶ 24 were materially false and misleading because the Arizona project was not "going quite well."  In fact, GTAT were experiencing significant problems with regard to the Arizona Facility and suffering from severe cash shortages.  Further, Defendants omitted that GTAT would not be receiving the final cash payment under the Apple Contract.

*May 8, 2014*

26.    On May 8, 2014, Defendants held their earnings conference call for the first quarter of fiscal 2014.  On that call, Defendant Gutierrez represented that "we expect our Sapphire materials business to provide a solid stream of return revenues once the build out in Arizona is complete. . . . In addition, we have now received three of the four prepayments we expected from Apple. . . . This brings total cash received from April to date to approximately $440 million. I remain very enthusiastic about out Sapphires materials and equipment business. While we cannot be specific with respect to the production ramp in Arizona, we continue to expect our Sapphire business to contribute over 80% of our revenue this year." Defendant Gutierrez further stated on the conference call that "we are producing Sapphire [for Apple] and that I expect the Sapphire that we produce will be fully utilized."

27.    Defendant Bal, the Company's current Chief Financial Officer, stated that the Company ended the quarter with $509 million in cash, which accounted for GTAT's receipt of the second portion of the down-payment under the Apple Contract.  According to Defendant Bal, GTAT received its third Apple prepayment of $103 million at the outset of the second quarter and

"[w]e expect the total prepayments [under the Apple Agreement] will fully fund[] our capital outlays related to the Arizona project." Defendant Bal further stated that "[w]e expect year-end cash, cash equivalents, and restricted cash of $400 million to $450 million, again reflecting the incremental CapEx discussed earlier."

28.     The statements set forth above in ¶¶ 26-27 were materially false and misleading because Defendants knew of the substantial impending risks confronting its sapphire material production segment and that GTAT was experiencing significant problems in terms of progress and operations under the Apple Contract. Defendants were also aware that they were facing a severe cash shortage and would be unable to complete development of the Arizona Facility. Finally, Defendants also knew that the total prepayments were not sufficient to fully fund development of the Arizona Facility.

*August 5, 2014*

29.     On August 5, 2014, Defendants held an earnings conference call to discuss GTAT's quarterly results for the second quarter of fiscal 2014. During the call, Defendant Gutierrez stated that "[t]he build-out of our Arizona facility, which has involved taking a $1.4 million square foot facility from a shell to a functional structure, and the installation of over 1 million square feet of Sapphire growth and fabrication equipment, is nearly complete. And we are commencing the transition to volume production." Further, Defendant Gutierrez told investors that "[t]he fourth prepayment from Apple is contingent upon the achievement of certain operational targets by [GTAT]. [GTAT] expects to hit these targets and receive the final $139 million prepayment by the end of October 2014. We remain very positive about our Sapphire materials business."

30.     During the same call, Defendant Bal also stated that the Company ended the quarter with $333 million of cash, cash equivalents and restricted cash, as compared to $509 million in

March.  GTAT's $333 million in cash was boosted by the Company's receipt of the third portion

of Apple's down-payment in the amount of $103 million.  Defendant Bal further stated that "[t]o

date we have received a total of $439 million in prepayments.  As Tom noted earlier, the fourth

prepayment is contingent on achievement of certain operational targets by [GTAT].  We expect to

attain these targets and receive the final $139 million prepayment by the end of October."

31.     Defendant Gutierrez assured investors on the call that "we don't expect to need to

go out into the marketplace to raise additional capital" and that "we're expecting to end the year

with approximately $400 million of cash on the balance sheet."  Defendant Gutierrez continued,

stating that "I feel very confident, based on the progress that we're making, that we will achieve

the milestone in that timeframe. But as I indicated with a projection of having close to $400 million

in the bank at the end of the year, it's not a world-ending event if it slides. Although, again, I don't

anticipate that it will slide."

32.     GTAT also represented in its Form 10-Q for the second quarter of fiscal 2014, filed

August 7, 2014, that "[t]he Company is currently in compliance, and based on the Company's

operational plans and financial forecasts, the Company expects to maintain compliance with the

operating metrics and financial covenants in the [Apple Contract] and management believes that

the Company will have sufficient cash resources to fund operations for at least the next twelve

months."

33.     The statements set forth above in ¶¶ 29-32 were materially false and misleading

because Defendants knew that it was extremely unlikely, if not impossible, that GTAT would not

receive the final portion of the down-payment under the Apple Contract, would imminently violate

the terms of the Apple Contract, and would further exacerbate its extreme cash shortage problems.

*August 26, 2014*

34.     On August 26, 2014, GTAT released an investor presentation into the market place titled "GT Advanced Technologies Corporate Overview."  Within the presentation, Defendants continued issuing bullish statements concerning the Company's progress and operations under the Apple Contract.  For example, Defendants stated that "Newly expanded sapphire materials business with Apple is expected to add recurring revenue base to business."  Further, the presentation misleadingly represented that GTAT's debt as of the second quarter for fiscal 2014 was only $294 million.

35.     The statements set forth above in ¶ 34 were materially false and misleading because Defendants entirely omitted the fact that GTAT was facing an impending extreme cash shortage and that GTAT's stated debt position failed to account that it had already received the majority of the down-payment under the Apple Contract (*i.e.*, $543 million of the total $578 million).  As of the date of the presentation, GTAT's debt had already increased to $644.8 million, over twice that which was represented by Defendants.

*September 9, 2014*

36.     On September 9, 2014, Apple unveiled the iPhone 6 and iPhone 6 Plus.  During the unveiling, Apple disclosed that GTAT's sapphire glass would not be used in production.  On this news, the price of GTAT stock dropped from $17.15 per share to $12.78 per share over two trading days, or over 25%.

THE TRUTH EMERGES

37.     On October 6, 2014, GTAT shocked the market by announcing that it had filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire.  The Company indicated that GTAT had just $85 million of cash

as of September 29, 2014, and listed approximately $1.5 billion in assets and approximately $1.3

billion in liabilities as of June 28, 2014.  On this news, the price of GTAT stock declined from

$11.05 per share to $0.80 per share, or almost 93%, on heavy trading volume.

### SCIENTER ALLEGATIONS

38.     Plaintiff alleges that the above material misrepresentations and omissions were made

by Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a)

securing additional financing to continue as a going concern; (b) raising capital in order to be able

to fund additional progress and production; (c) avoiding material defaults under the terms of the

Apple Contract; and (d) inflating market demand for GTAT shares.

39.     Defendants were aware of: (i) GTAT's cash shortages; and (ii) production and

progress under the Apple Contract.  In fact, the ability of the Company to continue as a going concern

depended on whether GTAT would be able to overcome these critical issues.

40.     Defendants intentionally inflated the stock price of GTAT common stock for the

purpose of reaping extraordinary amounts of proceeds from unusual and atypical insider sales.  The

following charts reflect insider sales made by Defendants Gutierrez and Gaynor (not including other

dispositions):

| Sales by Thomas Gutierrez During the Class Period | | | |
|---|---|---|---|
| *Transaction Date* | *Shares Sold* | *Price* | *Proceeds* |
| 2/3/2014 | 100,000 | 10.1946 | 1,019,460.00 |
| 2/3/2014 | 50,000 | 10.1941 | 509,705.00 |
| 2/3/2014 | 50,000 | 10.1944 | 509,720.00 |
| 3/11/2014 | 3,916 | 17.2453 | 67,532.59 |
| 3/11/2014 | 32,712 | 17.2291 | 563,598.32 |
| 3/11/2014 | 53,384 | 17.2584 | 921,322.43 |
| 3/11/2014 | 53,613 | 17.2749 | 926,159.21 |
| 3/12/2014 | 75,000 | 16.6563 | 1,249,222.50 |
| 3/13/2014 | 15,000 | 17.1257 | 256,885.50 |
| 5/1/2014 | 67,730 | 17.1791 | 1,163,540.44 |

| | | | |
|---|---|---|---|
| 5/1/2014 | 50,000 | 17.048 | 852,400.00 |
| 6/3/2014 | 78,054 | 15.771 | 1,230,989.63 |
| 7/1/2014 | 50,000 | 19.111 | 955,550.00 |
| 7/1/2014 | 9,232 | 19.1149 | 176,468.76 |
| 9/8/2014 | 9,232 | 17.3796 | 160,448.47 |
| **TOTALS:** | **697,873** | | **10,563,002.85** |

| Sales by Richard Gaynor During the Class Period | | | |
|---|---|---|---|
| *Transaction Date* | *Shares Sold* | *Price* | *Proceeds* |
| 12/12/2013 | 46,250 | 7.95 | 367,687.50 |
| 12/12/2013 | 25,000 | 8.0357 | 200,892.50 |
| 12/12/2013 | 15,000 | 8.01 | 120,150.00 |
| 12/12/2013 | 2,750 | 8.0538 | 22,147.95 |
| 12/12/2013 | 3,500 | 8.04 | 28,140.00 |
| 2/3/2014 | 20,000 | 10.3094 | 206,188.00 |
| 2/3/2014 | 20,000 | 10.3101 | 206,202.00 |
| 2/3/2014 | 20,000 | 10.3418 | 206,836.00 |
| 2/3/2014 | 37,500 | 10.251 | 384,412.50 |
| 2/3/2014 | 18,750 | 10 | 187,500.00 |
| 2/3/2014 | 8,000 | 9.6378 | 77,102.40 |
| **TOTALS:** | **216,750** | | **2,007,258.85** |

41.     As indicated above, Defendants Gutierrez and Gaynor alone reaped over $12.5 million from insider sales during the Class Period.  These sales were unusual in both timing and amount and, as such, are highly indicative of scienter.

42.     In addition to Defendants Gutierrez's and Gaynor's insider sales, other non-party GTAT insiders also profited from Defendants' fraudulent scheme.  Specifically, Ernest Godshalk (director) sold over $2.7 million during the Class Period, Thomas Wroe (director) sold over $260,000, Jeffrey Ford (Vice President of DSS Sales / China Support) sold over $4.1 million, Daniel Squiller (Chief Operating Officer) sold over $2 million, Hoil Kim (Vice President, Chief Administrative Officer, General Counsel, and Secretary) over $3.6 million, and David Keck (Executive Vice President, Worldwide Sales and Services) sold over $3.8 million.

13

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired GTAT's common stock during the Class Period.   Excluded from the Class are Defendants and their families, directors, and officers of GTAT and their families and affiliates.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of June 28, 2014, there were approximately 138 million shares of GTAT stock outstanding, owned by hundreds or thousands of investors.

45.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        A.     Whether Defendants violated the Exchange Act;

        B.     Whether Defendants omitted and/or misrepresented material facts;

        C.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        D.     Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

        E.     Whether the price of GTAT common stock was artificially inflated;

        F.     Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.    The extent of damage sustained by Class members and the appropriate measure of damages.

46.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

47.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.

48.    Plaintiff has no interests which conflict with those of the Class.

49.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

50.    Joinder of all Class members is impracticable.

## RELIANCE

51.    At all relevant times, the market for GTAT's securities was an efficient market for the following reasons, among others:

A.    GTAT stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

B.    As a regulated issuer, GTAT filed periodic public reports with the SEC and NASDAQ;

C.    GTAT regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    GTAT was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for GTAT common stock promptly digested current information regarding GTAT from all publicly available sources and reflected such information in the price of GTAT common stock. Under these circumstances, all purchasers of GTAT common stock during the Class Period suffered similar injury through their purchase of GTAT common stock at artificially inflated prices and the presumption of reliance applies.

53.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Defendants failed to disclose material adverse information regarding GTAT's operations and financial performance. Specifically, GTAT failed to disclose the true status of its progress and operations under the Apple Contract. Because the facts withheld were material to investors, Plaintiff is entitled to a presumption of reliance.

LOSS CAUSATION

54.    Defendants intentionally or recklessly made materially false and misleading statements and omissions during the Class Period. This artificially inflated the price of GTAT common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 6, 2014, the price of GTAT securities fell precipitously. As a result of their purchases of GTAT securities during the Class Period, Plaintiff and other members of the Class suffered economic loss.

16

## SAFE-HARBOR NOT APPLICABLE

55.     The Private Securities Litigation Reform Act's statutory "safe harbor" is not applicable in this action.   Defendant are liable for false and/or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of GTAT who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## COUNT I

(Section 10(b) of the Exchange Act and Rule 10b-5)

56.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

57.     Plaintiff's claims under the Exchange Act are premised on the material misrepresentations and omissions discussed above.

58.     Plaintiff alleges that the above material misrepresentations and omissions were made by Defendants either intentionally and/or with deliberate reckless disregard.

59.     Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law.  Likewise, because of their key roles in the Company, Defendants caused GTAT to act in the manner it did and perpetuate the material misrepresentations and

omissions throughout the Class Period.  Defendants acted with the requisite intent to establish liability under the Exchange Act.

60.     This claim was brought within the applicable statute of limitations.

61.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5, and are liable to Plaintiff and the other members of the Class.

## COUNT II

### (Defendants Violated Section 20(a) of the Exchange Act)

62.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

63.     GTAT has violated Section 10(b) of the Exchange Act as set forth above.

64.     During the Class Period, Defendants participated in the operation and management of GTAT, and conducted and participated, directly and indirectly, in the conduct of GTAT's business affairs.  Because of their senior positions, they knew the adverse non-public information about GTAT's operations and progress under the Apple Contract.

65.     As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to GTAT's operations and progress under the Apple Contract, and to correct promptly any public statements issued by GTAT that had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GTAT disseminated in the marketplace during the Class Period concerning GTAT's results of operations.  Throughout the Class Period, Defendants exercised their power and authority to cause GTAT to engage in the wrongful acts complained of herein.  Defendants therefore, were

"controlling persons" of GTAT within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GTAT securities.

67.    Each of the Defendants, therefore, acted as a controlling person of GTAT.  By reason of their senior management positions and/or being directors of GTAT, each of the Defendants had the power to direct the actions of, and exercised the same to cause, GTAT to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over the general operations of GTAT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.    By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GTAT.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against the defendants for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  October 9, 2014                                  Respectfully submitted,

                                                         MALLORY & FRIEDMAN, PLLC


                                          By:     /s/   Mark Mallory
                                                  Mark L. Mallory, NH Bar No. 1599
                                                  Mallory & Friedman, PLLC
                                                  3 North Spring Street
                                                  Concord, NH 03301
                                                  (603) 228-2277
                                                  mark@mallloryandfriedman.com

                                                  *Local Counsel for Plaintiff*
                                                  *Marlene Elizabeth Holland*


                                                  Nicholas I. Porritt (to be admitted pro hac vice)
                                                  Adam M. Apton (to be admitted pro hac vice)
                                                  LEVI & KORSINSKY LLP
                                                  1101 30th Street NW, Suite 115
                                                  Washington, DC 20007
                                                  Tel: (202) 524-4290
                                                  Fax: (202) 337-1567
                                                  nporritt@zlk.com
                                                  aapton@zlk.com

                                                  *Counsel for Plaintiff Marlene Elizabeth Holland*
                                                  *and Proposed Lead Counsel for the Class*